11584

SMITH *ET AL.* v. SAYE *ET AL.,* PERMANENT ROAD COMMISSION OF YORK COUNTY

(125 S. E., 269)

1. CERTIORARI—ELECTION IRREGULARITIES MENTIONED IN PROTEST FILED, BUT NOT PLEADED IN PETITION, NOT CONSIDERED.—In certiorari to review action of Permanent Road Commission of a county, in declaring result of road bond issue election, irregularities and illegalities in the conduct of the election, specified in protest filed with the Commission, but not pleaded in the petition for writ of certiorari, will not be considered.

2. CERTIORARI—OBJECTIONS TO REGULARITY OF ELECTION PRESUMED NOT SUSTAINED IN VIEW OF DECREE.—In certiorari to review action of Permanent Road Commission of a County, in declaring result of road bond election, the Court, on appeal from decree affirming validity of election, after eliminating votes cast in certain precincts, will assume that objections made to the entire election, such as noncompliance with Civ. Code, 1922, §§ 215, 220, were not sustained, and will not consider such objections.

3. COUNTIES—BOND ELECTION HELD VALID IN FAVOR OF ISSUE, NOT-WITHSTANDING IRREGULARITIES SHOWN NOT TO HAVE ALTERED RESULT.—Road bond issue election held under Act March 20, 1923, *held* valid election in favor of issue, notwithstanding irregularities in certain precincts, where majority in favor of bond issue exceeded largest possible number of illegal votes.

4. COUNTIES—ENTIRE BOND ISSUE ELECTION DECLARED VOID IF ENTIRE VOTE IN CERTAIN PRECINCTS CONSTITUTING EIGHTY PER CENT OF TOTAL IS ELIMINATED.—Where vote in certain precincts on road bond election, held under Act March 20, 1923 (33 St. at Large, p. 881), constituted eighty per cent of the total votes, the entire election should be declared void if the voting in such precincts was so permeated with illegality as to require elimination of entire vote therein.

5. CERTIORARI—COURT BOUND BY FINDINGS OF FACT OF BOARD IF SUSTAINED BY EVIDENCE.—Facts found by Board of Canvassers, in declaring result of road bond issue election, under Act March 20, 1923 (33 St. at Large, p. 881), are not open to controversy on certiorari, unless findings are without evidence to support them.

Before HENRY, J., York, January, 1924. Decree reversed and report confirmed.

Certiorari by M. L. Smith and others against J. H. Saye and others, as Permanent Road Commission of York County, to review the action of the Commission, declaring the result of a road bond election in favor of issue. From a decree declaring the election valid against issue, defendants appeal. Decree reversed, and report confirmed.

The petition, return, decree of Judge Henry the report of the board, with the dissent of W. W. Lewis thereto, follow:

NOTE: On applicability of constitutional or statutory provisions relating to general elections, to elections other than those for the selection of officers, see note in 14 L. R. A. (N. S.), 850.

PETITION FOR WRIT OF CERTIORARI

To Hon. J. K. Henry, Circuit Judge of the Sixth Judicial
   Circuit:

The petition of M. L. Smith, J. A. Tate, and John T.
Roddey, on behalf of themselves and all other taxpayers
of the county of York who may come in and contribute to
the costs of this proceeding, respectfully shows to your
Honor:

(1) That each of your petitioners is a resident and tax-
payer residing in the county of York, in the State of South
Carolina, and as such is interested in the matters and things
hereinafter set forth.

(2) That the respondents, Dr. J. H. Saye, W. W. Lewis,
J. T. Crawford, L. A. Harris, and W. P. Goodman, are
citizens and residents of the county of York, state afore-
said, and by an act of the General Assembly of this State,
approved the 20th day of March, A. D. 1923, 33 Statutes
at Large, pp. 881-885, were constituted a board of com-
missioners, to be known as the "York County Permanent
Road Commission," and as your petitioners are informed
and believe they have each duly qualified and are now, and at
the times hereinafter mentioned were, acting under the
powers conferred upon them by the terms of the said act
of the General Assembly.

(3) That by the terms and provisions of said act of the
General Assembly the respondents were authorized and
empowered to issue coupon bonds of the county of York
for permanent highway construction and the construction
of permanent bridges in said county, but the said act fur-
ther provided that the question of issuing said bonds should
be first submitted to the qualified electors of York County
at such time as the said commission might appoint and desig-
nate, upon giving the notice provided in said act. And the
said commission was further authorized and empowered to
appoint the managers of election for each precinct, and said

managers of such election were authorized to declare the result and certify the returns thereof to said commission.

(4) That Section 14 of said act of the General Assembly provided as follows:

"If a majority of the ballots cast in said election are in favor of said issue of bonds upon the filing of the returns by the managers of election with this commission, this commission shall thereupon certify the results of said election and file the same with the Clerk of Court of Common Pleas for York County showing the number of those who voted in favor of the issue of said bonds and the number who voted against the issue of said bonds and thereupon the commission herein appointed is hereby authorized, empowered and directed to proceed to issue the bonds as hereinbefore provided for and dispose of the bonds as herein provided and to proceed with their duties as herein set forth."

(5) That in pursuance of the provisions of said act of the General Assembly, the said commission fixed and designated the 23d day of October, 1923, as the day for holding the special election upon the question of issuing said bonds, and they appointed managers to conduct said election at the various election precincts in York County, and on said date the said election was held and conducted by said managers, as required by the terms of said act.

(6) That thereafter and upon notice being given, the said commission met at the Courthouse in York on Tuesday following, and then and there proceeded to organize as a county board of canvassers by electing the respondent, Dr. J. H. Saye, as chairman, and L. A. Harris, as secretary, and taking the constitutional oath; all of which was done under and according to the provisions of Article 2, c. 10, §§ 244-250, Vol. 3, Code of Laws for South Carolina for 1922.

(7) That thereupon, at said time and place, your petitioners appeared by their attorneys and, on behalf of

themselves and all other citizens and taxpayers of York County who might be willing to come in and contribute to the costs and expenses thereof, duly filed their notice and grounds of contest of said special election. That the general grounds of your petitioners protest and contest of said election were that the managers of said election at the precincts of Rock Hill and Fort Mill in said county permitted and allowed numerous persons to vote at said election without the production of registration certificates; but in lieu thereof permitted said persons to vote upon irregular and illegal certificates, which were issued to said persons on the day of said election by F. E. Clinton, one of the supervisors of registration for said county, in violation of Section 207, Vol. 3, Code of Laws for South Carolina, and that the number of persons so voting upon such illegal registration certificates were sufficient to affect the result of said election, or render the same of doubtful validity. And upon the further ground that the managers of said election allowed and permitted numerous persons to vote at the precincts of Rock Hill and Fort Mill without legal proof that such persons had paid all taxes due by them for the year 1922, including State, county, municipal, poll, and State income taxes, but on the contrary accepted as proof of the payment of State and county taxes certificates signed and issued by Harry E. Neil on the day of said election to the effect that such taxes had been paid, the said Harry E. Neil then and there not being officially authorized to issue such certificates. And, also, upon the ground that the managers of election at the precinct of Fort Mill permitted numerous persons to vote at said election without legal proof of the payment of all taxes due by them, but on the contrary accepted certificates issued by the banks of Fort Mill, to the effect that the State and county taxes of such persons had been paid; all of which was contrary to the Constitution and Statutes of this State. And upon the further ground that the registration books of the county of

York were not closed and kept closed, as to the said election, for 30 days, preceding the holding thereof, nor were said books kept in the custody of the Clerk of Court for said county, as required by law, but on the contrary certain books of registration were taken by F. E. Clinton, one of the supervisors of registration, and were carried by him to the precinct of Rock Hill where, on the day of said election, he proceeded to issue numerous certificates of registration in violation of Sections 207 and 214 of the Code of Laws of 1922, and that the managers of election permitted a very great number of persons, sufficient to affect the result of said election, to vote upon the production of such illegal certificates of registration. And upon the further ground that more than one-half of the voters voting at the precinct of Fort Mill were not sworn by the managers of election, as required by the Statutes of this State. And upon the general ground that the number of persons voting upon illegal registration certificates, and without proof of the payment of all taxes due by them and without being sworn, was sufficient to change the result of said election and render the same illegal, null, and void or of such doubtful validity, that the said election should be declared null and void.

(8) That the said commission upon hearing the grounds of said protest and contest proceeded to take testimony thereon, but notwithstanding the fact tha such testimony fully sustained the contention of your petitioners, as they are informed and believe, the said commission, acting as a board of canvassers, by a vote of four to one sustained the validity of said election, and refused to declare the same null and void.

(9) That thereupon your petitioners duly served notice and grounds of appeal from the decision of said commission, acting as a board of canvassers, to the State Board of Canvassers; but the attorneys for said commission have notified the attorneys for your petitioners that they would

not cooperate with them in the effort to have the matter reviewed by the State Board of Canvassers on said appeal, and that they would resist the same upon the ground that no appeal can be taken to the said Board of State Canvassers, because there is no provision in the act of the General Assembly, aforesaid, providing for such an appeal, and such appeal has not yet been heard, but the notice of such appeal has been duly filed with the Secretary of State.

(10) That the testimony taken on the contest of your petitioners before said commission showed that there are more than 8,000 names of voters on the registration books of York County, and that there are 21 voting precincts in said county of York; that upon the canvass of the returns of the managers of the various precincts in said county it appeared that the total vote in said election was 1,678 votes, of which 1,005 votes were cast in favor of the issue, and 673 votes were cast against the issue of said bonds; that of the said total votes cast in the county of York 812 votes were cast at the precincts of Rock Hill and Fort Mill, there being a total of 680 votes cast at the precinct of Rock Hill, and a total of 132 votes cast at the precinct of Fort Mill; that it will appear from the tabulated statement of said votes made by said commission that if the polls at the precincts of Rock Hill and Fort Mill are thrown out on account of the irregular and illegal votes cast, as aforesaid, the result would then be a total of 287 votes in favor of the issue of said bonds, and a total of 579 votes against the issue of said bonds.

(11) That your petitioners allege that the said commission, acting as a board of county canvassers, erred in the following particulars:

(a) Because the said Board of County Canvassers erred in not declaring the votes in said election at the precinct at Fort Mill utterly null and void, and in not throwing out said box and votes at Fort Mill, when the testimony clearly showed that numerous persons were permitted to vote in

said election, and at said precinct, without the production of proper registration certificates, but in lieu thereof permitted numerous and sundry persons to vote upon irregular registration certificates issued by F. E. Clinton, a member of the board of registration for said county, without authority of law, upon the day of said election, and also numerous persons to vote at said precinct of Fort Mill, without legal proof of the payment by them of all taxes due and collectible during the previous year, and, also, upon the further ground that the undisputed proof showed that at least one-half of the voters voting in said election and said precinct were not sworn according to law.

(b) Because the said Board of County Canvassers erred in sustaining the validity of the said election at the precinct of Fort Mill, when the evidence showed that numerous persons were permitted to vote without the production of legal registration certificates and due proof of the payment of all taxes, and when at least one-half of said voters were not sworn, and said board of canvassers should have declared the election at such precinct utterly null and void, and should have thrown out the entire poll at said precinct.

(c) Because the said Board of County Canvassers erred in sustaining the validity of said election at the precinct of Rock Hill, when the undisputed testimony showed that at least a hundred or more persons were permitted by the managers of the election to vote at said precinct upon the production of illegal registration certificates issued on the day of election by F. E. Clinton, one of the supervisors of registration for the said county, and issued without any warrant or authority of law.

And, also, uopn the ground that the managers of the election permitted a very large and indefinite number of persons to vote at said precinct upon illegal certificates to the effect that said persons had paid all taxes due for the previous year, or that there had been no taxes assessed against them, which certificates were issued by H. E. Neil,

former county treasurer on the day of the election without warrant or authority of law.

(d) Because the said Board of County Canvassers erred in not holding that the said election at the precinct of Rock Hill was null and void, and in not throwing out the entire poll at said precinct, upon the ground that at least a hundred or more persons were permitted to vote without the production of legal registration certificates, and without the production of legal proof that such voters had paid all taxes due by them, and when the number of persons so voting was so large that the exact number was unknown, and when it was impossible to purge the said poll on account of the fact that it was impossible to determine the number of said illegal voters, or how they voted at said election, and the said Board of County Canvassers should have declared the election at said precinct to be utterly null and void.

(e) Because the said Board of County Canvassers erred in sustaining the validity of said election at Rock Hill precinct, when the undisputed evidence showed that there was a large number of illegal votes cast at said precinct at said election; the number thereof being clearly such as to render the result doubtful, and the poll at said precinct should have been entirely thrown out as being null and void by said board of canvassers.

(f) Because the said County Board of Canvassers erred in not throwing out the polls in the precincts of Fort Mill and Rock Hill, in the canvass of the result, for the reason that said polls could not be purged of illegal votes, and if the said polls had been thrown out, then the result of said election would have been changed, and the said board of county canvassers erred in not so holding and deciding.

(g) Because the said Board of County Canvassers erred in holding that the duplicate certificates of registration issued by F. E. Clinton on the day of said election were then good and valid registration certificates issued under the authority of law, and entitling the holder thereof to vote

thereon at said election, whereas they should have held that said duplicate registration certificates were utterly illegal, null, and void, and that said voters could not vote on the production thereof.

(h) Because the said Board of County Canvassers erred in holding and finding that the certificates of payment of taxes issued by Mr. H. E. Neil at the Rock Hill precinct on the day of said election complied with the law, and were sufficient proof of the payment of taxes, whereas the said board of canvassers should have held that said certificates were issued without warrant of law, were of no legal force and effect, and were not sufficient proof of the payment of taxes to entitle the holders thereof to vote thereon in said election.

(i) Because the Board of County Canvassers erred in not holding and finding that the illegal voting at Rock Hill and Fort Mill precincts was to such an extent that the whole election should have been set aside and declared null and void, as not being a full and fair expression of the legal voters of York County.

(j) Because the undisputed evidence showed that the books of registration for York County were not closed, and kept closed, as to the said election, for 30 days, preceding said election, but were opened at Rock Hill on the day of election, and on this ground the said board of canvassers should have held that the whole election was null and void, and was not a full, fair, or just expression of the voters of said county, and the opening of said books of registration at Rock Hill on the day of election without notice thereof was an unfair, unjust, and illegal discrimination against the voters in other sections of said county.

(k) Because the books of registration were not kept in the office of the Clerk of Court, as required by law, but were illegally taken to Rock Hill and there opened for the issuance of registration certificates, without notice to other citizens of said county, who were thus discriminated against

by such illegal issuance of duplicate registration certificates; and upon this ground the said board of canvassers should have declared the whole election null and void.

(1) That at the precincts of Fort Mill and Rock Hill a sufficient number of voters were permitted to vote without legal proof of the payment of all taxes, including state income taxes and municipal taxes, and the number so voting, together with those voting without the production of legal registration certificates, and without legal proof of the payment of State and county taxes, were sufficient not only to change the result of the election at said polls, but sufficient to change the result of the election throughout the entire county.

(m) Because the said Board of Canvassers erred in not holding that the number of illegal voters voting at the precincts of Rock Hill and Fort Mill were sufficient to render the result of the election doubtful and, therefore, the whole election should have been declared illegal, null and void.

(12) That the State Board of Canvassers, as your petitioners are informed and believe, have no power or authority finally to determine whether an appeal in this proceeding can be taken from the decision of the said commission, acting as a board of canvassers, to the State Board of Canvassers, and your petitioners are further informed and believe that no final determination of the question·here in issue can be had, except upon a writ of *certiorari* issued by this Court, for the purpose of having the record in said contest brought before this Court for a final determination, and they are informed and believe that the said issues are of such public interest and importance as to merit a full and prompt determination thereof by the Court, and your petitioners have no other full, speedy, and adequate remedy in the premises.

Wherefore, your petitioners pray:

(1) That in case this Court shall determine that an appeal lies from the decision of said commission, acting as a board

of canvassers, to the State Board of Canvassers, then and in that event that this Court may issue its order requiring said commission to forthwith certify the record of said contest and of all of the proceedings thereon to the said State Board of Canvassers for its consideration and determination.

(2) That in case this Court shall decide that no such appeal can be taken from the decision of said commission, acting as a board of canvassers, to the State Board of Canvassers, then and in that event, that this Court may issue its writ of *certiorari* to said commission, requiring it forthwith to certify the record of said contest and all proceedings thereon to this Court, and that the said commission be required to make its return to said writ within such time as may be fixed by this Court for a hearing thereon.

(3) For other and further relief in the premises as may be considered by this Court to be meet and just.

December 8, 1923.

McDONALD & McDONALD,

Attorneys for Petitioners.

State of South Carolina, County of York.

Personally appeared John T. Roddey, and on oath says, that he is one of the petitioners in the above entitled proceeding, and that he has read the foregoing petition, and that the same is true of his own knowledge, except the matters and things therein stated on information and belief, and as to those matters he believes it to be true.

JNO. T. RODDEY.

Sworn to and subscribed before me this 7th day of December, 1923.

Ed Westbrook, Notary Public for S. C.

RETURN OF THE RESPONDENTS YORK COUNTY PERMANENT ROAD COMMISSION TO WRIT OF CERTIORARI

The respondents herein, J. H. Saye, W. W. Lewis, J. T. Crawford, L. A. Harris, and W. P. Goodman would respectfully make the following return in the order of his

Honor, J. K. Henry, Circuit Judge, dated December 18,. 1923:

(1) That by Act of the General Assembly of this State,. approved March 20, 1923, 33 Statutes, 881, respondents were constituted and designated as a board of commis- sioners, known as the York County Permanent Road Com- mission, and that each of the said respondents have duly qualified and are performing the acts and duties conferred upon them by the said statute.

(2) That pursuant to the powers given and conferred upon them by the said act of the General Assembly, the said respondents caused to be held on the 23d day of October, 1923, a special election in the said county, for the purpose of determining as to whether $2,000,000 of bonds for the said county should be issued for building of permanent roads in accordance with the said act; that the said election was duly held and that thereafter the said commission met at the courthouse at York, S. C., to canvass the returns of the said election and to declare the result.

(3) That at the time of the said meeting of the com- mission for the purpose of canvassing the result of the said election, the petitioners herein, M. L. Smith, J. A. Tate, and John T. Roddey, duly appeared by counsel, and filed in writing their objections to the said election and asking that the said election be declared null and void, the various grounds of protests and objections being in- corporated with the record which is handed up herewith.

(4) That the commission upon the filing of the said pro- tests and objections proceeded to take testimony as to the same, and several hearings were had on several different dates, and the testimony taken at the said hearings is also incorporated and included in the record handed up here- with.

(5) That at the conclusion of the said testimony ar- guments of counsel were had, and the commission pro- ceeded to consider all questions raised in the said protest

and objections, and immediately thereafter the majority of the said commission filed its report overruling the ground of the said election and declaring the result of the same to be 1,005 votes in favor of the issuance of bonds, and 673 against the issuance of bonds. That the report of this commission setting forth its grounds and findings on the said protests are incorporated in the record herein; that one member of the said commission, W. W. Lewis, filed a minority report sustaining the protests of the election, and the said report is incorporated with the record herein.

(6) That immediately upon filing of the said report all the records of the said commission pertaining to the said election were filed in the office of the Clerk of Court of York County, as provided for by law, and the said records have so remained in the office of the said clerk until the order of his Honor, J. K. Henry, dated December 18, 1923, was made, and that in accordance with the said order this commission does now herewith certify a return. The complete record and proceedings in connection with the said bond election held in York County on October 23, 1923, together with all the minutes, papers, and exhibits, were introduced before the commission on the hearing of the protest to the said election filed by petitioners herein.

Respectfully submitted, J. H. Saye, Chairman, W. W. Lewis, L. A. Harris, W. P. Goodman, As constituting the York County Permanent Road Commission. December, 1923.

DECREE

On the 23d day of October, 1923, an election was held in York County on the question of issuing $2,000,000 in bonds of said county for the construction of permanent roads in said county. The election was held under the provisions of an Act of the General Assembly of the State, approved the 20th day of March, 1923 (33 St. at Large, p. 881). The respondents, under the provision of said act, were designated and constituted a board, to be known as

the York County Permanent Road Commission, and they were authorized to hold and conduct an election, to be participated in by the qualified electors of the county on the question of issuing said bonds, and declare the results of said election.

This board accordingly advertised the holding of said election at the various voting precincts in the county, on the 23d day of October, 1923, appointed the managers to conduct the said election, and in the advertisement thereof requiring the managers to take the same oath required by said act as administered to managers of elections under the general election law. And on Tuesday following the said board met at the courthouse in York and organized as a county board of canvassers to canvass the returns of the managers of the election and declare the results, at which time and place the petitioners herein duly appeared and filed notice and grounds of contest of said election, alleging illegality in the election held at the precincts of Ebenezer, Fort Mill, and Rock Hill, as will appear from the said notice and also the petition herein.

These grounds assail the validity of said election, because numerous voters at the said precincts of Fort Mill, Rock Hill, and Ebenezer were allowed to vote without production of registration certificates issued according to law and without due proof that said voters had paid all taxes due by them, and also because at least half of said voters at the Fort Mill precinct were allowed to vote without taking the oath as prescribed by the statute. Testimony was then taken by said board, acting as a board of canvassers, and by a vote of four to one the board sustained the validity of said election, overruling all of the grounds of contest. The board consisted of four laymen and one lawyer; the lawyer dissenting from the finding of the board and filing a dissenting opinion, with his reasons.

The matter came on to be heard before me at Chester on the 3d day of January, 1924. Counsel was heard at length

pro and con for the petitioners and respondents.    After
mature consideration my conclusions are as follows:

Reading the act providing for this election, I concluded
at first that it was the intendment of the General Assembly
to refer this question to the qualified electors of York
County in a wide open election, in that the holding of it was
left to the permanent board of road commissioners, in-
stead of the board of canvassers, to ascertain according to
their best judgment, in the conduct of the election, who were
the qualified voters and without specific rules to guide them,
because the only one provision of the general election law,
to wit, the swearing of the managers, was found in the act,
and by rule of construction other rules to govern an election
would be excluded.    And further, that it was the purpose
of the General Assembly to empower the said commis-
sioners, by leaving them free of restriction, except their
own honest judgment, to ascertain as best they could who
the qualified electors were, and thereby secure a fuller ex-
pression of their will.

But after further deliberation, I concluded that the Gen-
eral Assembly could not be guilty of "farming out" the
sacred privilege of franchise to be regulated by their judg-
ment, and there must be some provision of law by which
they would be directed.    Turning to the Constitution, I
find, in Section 8, Art. 2, that the General Assembly has
provided by law for the registration of all qualified electors,
and it is required to prescribe the manner of holding elec-
tions and of ascertaining the results of the same.    This
being true, I turned to the general election laws contained
in the Code and find that they do not control in elections,
general or special, unless the elections are held pursuant to
the Constitution of the State.    See Sections 23, Code of
Laws, 1922.

It is clear that this election is held not pursuant to the
Constitution, but pursuant to the statute.    In my dilemma
I turned then to the precedents furnished by the Supreme

Court. According to *Stackhouse v. County Board of Commissioners for Dillon County,* 86 S. C., 419, I find a precedent there, which, after argument putting logic to the test, and final appeal made to necessity, that the general election laws can be made to apply to the conduct of this election, and this being contended by both sides we hold that the general election laws do and should regulate the conduct of this election.

Now, the facts stated in the petition are admitted in every particular, except minor, unimportant matters. If these facts are true, there was no effort made to observe the law. An impartial mind, not knowing the high character of each member of this York County Permanent Road Commission and the managers of election appointed by them, and their counsel directing them, would conclude that there was a conspiracy among them to ignore all of the laws regulating elections, and get by with it, because it is true and admitted that the oath was not administered at the Fort Mill precinct to at least one-half of the electors; whether they were qualified or not, it does not appear. And it is admitted that so-called duplicate registration certificates, by the advice of counsel and arrangement with the managers, were accepted instead of the registration certificates required by law, and these duplicate certificates were issued at least by the hundred, and one of the commissioners of registration was kept busy the whole day furnishing them to all who might apply; this in the face of the law that the registration books must be closed at least 30 days prior to any general or special election.

In the matter of proof of payment of all taxes required by the Constitution, certificates of the former treasurer were taken and accepted as conslusive proof of payment of such taxes, and his certificate that electors were not liable for taxes was also taken as sufficient proof, and the statements of bankers and individuals were also taken at Fort Mill precinct as conclusive proof of the payment of taxes. The

former treasurer, by previous agreement with the managers, went to Rock Hill on the day of the election, and spent the day there, issuing duplicate certificates to those who applied for them, for these precincts.

I hold that such certificates are not conclusive proof of payment of taxes, and that the managers of elections should have had such proof as would be accepted by the Court, at least under oath, unless by an officer charged with the collection of taxes.

I further hold that the certificates furnished, to be conclusive, must show all taxes paid due at least to the county and State for the previous years, including income taxes, but not municipal taxes, bectuse municipal taxes are provided for by another section of the Constitution referring to municipalities. I know that Courts will not declare an election void for inadvertencies, irregularities, or even illegalities, or for fraud in certain causes, if the result of the discrepancies, irregularities, illegalities, and frauds can be eliminated or wholly chargeable to the conduct of officers, the electors not consenting.

The electors here condone the illegal conduct of the officers. I cannot see, in this case, how the results of these violations of law can be eliminated, because Mr. Neil, the former treasurer, in his testimony, gives the number as an estimate. I cannot see how the election could be declared a fair expression of the will of the qualified electors of York County, to obtain which most assuredly was the purpose of the act, when it appears that at no other precincts except the three, Ebenezer, Rock Hill, and Fort Mill, was the same opportunity for the free expression of their will given to them that was given at these three precincts. Certainly it cannot be concluded with any degree of certainty what the results of this election would have been if the law had been fairly administered or an equal or like opportunity given at every precinct to the qualified electors of the county on the day of the election. Nor can I see how any

impartial mind could determine accurately what would have been the results at Rock Hill, Ebenezer, and Fort Mill if the law had been strictly observed, and the prerequisites of the Constitution required of the electors voting.

For these reasons I must hold the election held at the precincts of Ebenezer, Rock Hill, and Fort Mill null and void, and the majority in the county against the issue of the bonds.

This is another example of the danger of the General Assembly turning over to a commission, composed of men necessarily intently interested in the success of the enterprise with which they may be charged, the right to supervise and regulate the exercise of the sacred privilege of franchise of a free people. J. K. Henry, presiding Judge, Sixth Circuit. Chester, S. C., January 10th, 1924.

### REPORT OF THE YORK COUNTY PERMANENT ROAD COMMISSIONERS AS TO ELECTION

The York County Permanent Road Commissioners, consisting of Dr. J. H. Saye (Chairman), W. W. Lewis, J. T. Crawford, L. A. Harris, and W. P. Goodman, met at York, S. C., on Tuesday, October 30, 1923, to canvass the results of the special election held on October 23, 1923, on the issuance of $2,000,000 bonds for the said county for permanent roads. All members of the commission were present. At the first meeting of the commission the above-named protestants filed in writing their objections protesting as to the said special election, and asking that the same be declared null and void. The committee then proceeded to hear the testimony of the said protestants, and the same has been taken by a stenographer and hereto attached as a part of this report.

1. The first objection is that the managers of election at the voting precincts at Fort Mill and Rock Hill permitted numerous persons to vote in the said election without production of registration certificates, and that in lieu thereof

permitted numerous and sundry persons to vote upon irregular registration certificates issued by F. E. Clinton, a member of the registration board.

Testimony shows that the day before the election Mr. F. E. Clinton called J. D. Gwinn, another member of the registration board, who resided at Sharon, over the phone and asked Mr. Gwinn for authority to sign his name to some duplicate registration certificates which he (Clinton) had been requested to issue. Although Gwinn testifies that he understood Clinton to ask for authority to sign only two registration certificates, the testimony clearly shows that all parties understood that Gwinn gave Clinton full authority to sign his name to the said certificates, as Gwinn stated that the same was done on the advice of W. B. Wilson, attorney; that he would look to W. B. Wilson as to the legality of it. Acting upon the authority given to him by Mr. Gwinn and under advice of Mr. Wilson, the said F. E. Clinton, the day before and on the day of election, issued a number of registration certificates to parties applying, on statement that their original certificate had been lost. These certificates issued bore the name of F. E. Clinton and J. D. Gwinn, two members of the board; Mr. Clinton signing the same for Gwinn under the authority above given; the said certificates being marked "duplicate" and bore the date of the original certificate issued to said party applying.

In our opinion the issuance of these certificates was not irregular, and was legal, and voters presenting themselves at the polls had a right to vote upon the same, under Section 214, Vol. 3, Code 1922, and all the other constitutional provisions and statutory regulations as to registration. The above section provides that any elector registered who, after January 1, 1898, shall be entitled to another certificate upon application and proof of such destruction and loss, if his name appears upon general enrollment made by the board of registration, if otherwise qualified. There is nothing in said section limiting the time in which such other

certificate shall be issued, and after names of all voters to whom said certificates were issued did appear upon the general enrollment book, as all such did appear, and if satisfactory proof of loss was furnished, then such certificates could be issued. The fact that the Constitution and statutes require that the registration books shall be closed 30 days prior to any election does not affect this view; for the said provision only has reference to the adding, transferring, or alteration of names on the books. The certificates issued by Clinton did not add the names of any voter or take any name from the books, and were merely other or duplicate certificates issued to parties whose name appeared on the books, as we think, under the authority of the law.

But, nothwithstanding this, we do not think that the said certificates issued affect the result of the election. The Supreme Court has held as a general rule that, where the result of the election is not made doubtful or changed, irregularities and illegalities in absence of fraud will not be sufficient to set an election aside. *State v. Board of Canvassers,* 79 S. C., 248; 60 S. E., 699; citing *Wright v. Board of Canvassers,* 76 S. C., 574; 57 S. E., 536; and *Birchmore v. Canvassers,* 78 S. C., 461; 59 S. E., 145; 14 L. R. A. (N. S.), 850; 13 Ann. Cas., 1133; and the Court has further held that, even if votes are illegal, where the same can be eliminated from ballot box, then the said votes would not vitiate the said election. *Rawl v. Mc-Cown,* 97 S. C., 1; 81 S. E., 958. *Birchmore v. Canvassers,* 78 S. C., 461; 59 S. E., 145; 14 L. R. A. (N. S.), 850; 13 Ann. Cas., 1133.

In view of the general rule, the testimony about these registration certificates may be considered. It appears that 147 certificates were made out by Clinton, as shown by his record of the number 5 were immediately destroyed, and were never delivered to any one, on account of certain mistakes made in writing them. This left 142 certificates, which were issued to voters at Rock Hill and Fort Mill

precincts of the number; it was conclusively proven that 26 of Fort Mill and 5 of the Rock Hill certificates, or 31 in all, were never delivered to voters and never used at the polls. This left 111 of the said certificates to be accounted for.

According to the tabulated and official return of this election presented to the commission, the majority voting in favor of the said bonds was 332 and even if the 111 certificates in question upon which people voted are eliminated, and assuming that they all voted in favor of the said bonds, the result is 221 majority in favor of the bonds. For this additional reason the first objection on the ground of protest is overruled.

(2) The second objection is that a number of electors at Fort Mill and Rock Hill precincts voted at the said precincts without any legal proof that such persons had paid taxes due for the year 1922, and that such voters were illegal, and were sufficient to effect the result.

The testimony is that on the day of election Mr. H. E. Neil, former county treasurer, York County, and who retired from office in July, 1923, was present in Rock Hill with the treasurer's duplicate tax book for the year 1922. Mr. Neil had previously secured permission from the present county treasurer, Mr. W. D. Thomasson, to use this book in Rock Hill on the day of election after Mr. Thomasson had been asked to go himself, or send a deputy for this purpose, and after Mr. Thomasson, the present treasurer, had stated that neither he nor his clerk could be spared from his office on the day of election. When the name of Mr. Neil was suggested as a person to go to Rock Hill for the purpose of giving certificates to voters from the books as to payment of 1922 taxes, Mr. Thomasson had suggested that Mr. Neil was the very person. Mr. Neil, the ex-treasurer, and who retired from office July 19, 1923, had been treasurer of York County for a period of over 15 years. He had made up the duplicate tax book in that

office for the year of 1922, and was thoroughly familiar with the entries on the same. And as it had to appear in this election that all voters had paid taxes before April 24, 1923, the original entry of the treasurer's book as to tax payment made before that date had been made by Mr. Neil. When the book was delivered to him by Mr. Thomasson, Mr. Neil went to Rock Hill and was present there on the day of election, and, when parties requested of him statements about 1922 taxes, he would check up the names asked for on the book carefully. If it were shown by the book that such party had paid the taxes as required, and, according to entry, made in the book by Mr. Neil, then Mr. Neil gave him a certificate to that effect. In several cases Mr. Neil refused to give statements to the persons applying, for the reason that the books did not show that the taxes were paid. In this connection there was introduced into evidence a letter from the managers of Rock Hill to Mr. Neil to the effect that they, the said managers, would accept Mr. Neil's certificates as county treasurer for 1922, as proof of payment of taxes by parties offering to vote.

On the day of and during the course of election not over 100 of such certificates were issued by Mr. Neil at Rock Hill precinct. No other such certificates were issued or used for other precincts.

The commission finds that the issuance of the said certificates by Mr. Neil were sufficient proof of payment of taxes, that the said act complied with the law, and the managers of election were justified in accepting the same. The law provides for proof of payment of taxes as prerequisite to voting, but does not state what proof shall be required, but only States that the certificates of the authorizer by law to collect the same shall be *conclusive* proof of the same. Our Supreme Court has held that any competent or legal proof which satisfies the managers of the election of the truth is sufficient proof. The certificates by Mr. Neil were the highest form of proof which could be

submitted, otherwise than for receipt itself, or statement from the present treasurer. We therefore hold that there was no irregularity on the manager's part of allowing those to vote who had paid their taxes on certificates of Mr. Neil. It has not been proved or suggested that Mr. Neil issued certificates to any one but those who actually paid taxes, and the careful manner in which he performed this service demonstrates that no party was allowed to vote on his certificate unless he was entitled to vote. We therefore overrule this ground of protest.

The same reasoning holds true as to some 10 people who were proven to have voted at the Fort Mill precinct on statements given by the National Bank of Fort Mill, and the Savings Bank of Fort ill, to the effect that the said parties had paid their taxes through the said banks for 1922, is true. We think that there was sufficient proof and evidence presented to the managers as to payment of taxes by these parties, and that the same were not irregular.

In addition to the foregoing reason, if the same were irregular as claimed, such irregularities could not affect the result of the election, for if the 100 certificates issued by Mr. Neil at Rock Hill and the 10 by the banks of Fort Mill, or 110 in all, are taken out of the ballot boxes, there would still be a majority of 112 votes in favor of issuance of bonds, and after due allowance has been made for the 111 registration receipts above mentioned. Hence these irregularities, if they could be so called, could not affect the result at any event, and we, the commissioners, overrule this ground of protest.

(3) The third ground of protest is that the supervisors of registration of York County failed to revise the list of registered voters at least 10 days preceding the said election as provided by law.

The testimony shows that such lists were revised at the time the books were closed 30 days prior to the election, by the addition of the names of all new voters entitled to vote

to the registration book of all precincts .30 days before the election.

But even if the supervisors of registration did not comply strictly with the duties placed upon them by law, this still would not be a vital defect in the election, and would not deprive people who were duly qualified and registered of the right to vote; as the fact that the managers of registration did not comply strictly with the law, either through ignorance or mistake or neglect, would not deprive duly qualified voters of the right to vote, nor would such action on part of the officers be sufficient to abrogate or annul votes duly and regularly cast at such election. See *Rawl v. McCown,* 97 S. C., 1; 81 S. E., 958.

(4) The fourth ground of protest, as to allowing of certain persons at Rock Hill and Fort Mill to vote without legal proof of payment of taxes, and the permitting of such people to vote on certificates issued by the banks as to taxes being paid, has already been passed upon above, and the commission overrules this ground of protest.

(5) The fifth ground of protest is that the registration books were not closed and kept closed for a period of 30 days preceding said election, and that F. E. Clinton, a member of the Yory County Board of Registration, illegally issued certificates and registered voters on the said books within 30 days. This ground of protest has also been considered and passed upon in consideration of first ground of protest above. It is sufficient to say that the commission does not find the action of Mr. Clinton at all illegal and that, as the commission sees the matter, he had the right under law to issue these certificates to persons who had lost their registration certificates, and whose names appeared upon the annual or general list made by the board of registration. It appears from the testimony that none of all persons to whom the said certificates were issued did appear on the annual enrollment and the special enrollment of this election, and that certificates were not issued by Mr.

Clinton to any person whose name did not so appear. This ground of protest is also overruled.

(6) The next ground is that the managers of election at Fort Mill precinct permitted a large number of voters to vote without being sworn, as required by law. While there is testimony that possibly one-half of the electors voting at this precinct were not sworn, yet some of the witnesses at the hearing before the board who voted at Fort Mill testified that they were sworn. The testimony further shows by check of the treasurer's tax books with the poll list, and from other evidence, that every voter appearing on the poll list, with the possible exception of one, who voted at Fort Mill precinct, had paid their taxes as required by law, and that every voter at said precinct produced his or her registration certificate. It is true that 16 of these voters did vote upon the duplicate registration certificate issued by the registration board on the day before the election, but the validity of this has already been passed upon. The evience then clearly shows that the election at Fort Mill was regularly and fairly conducted so far as the requisite of payment of taxes and registration is concerned.

But, additional to this, we hold that the provision of the law in regard to voters taking oath at the poll is merely directory upon the managers, and is not mandatory, and therefore, since the managers have required the production of the registration certificate and evidence of payment of all taxes of all voters as prerequisites to their right to vote, the failure of the managers to require the oath would not be a fatal defect, and would not vitiate the election at this box, nor would such failure to require the oath justify the throwing out of this box. *State v. Board of Canvassers,* 86 S. C., 460; 68 S. E., 676.

The conclusions above announced dispose of all the objections filed by protestants as to the said election. The commission therefore holds and declares that the said election was fairly and regularly conducted, and that the re-

sult of the said election was 1,005 votes for the issuance of bonds, and 673 against the issuance of bonds, and the commission so declares and certifies the above as the result of the said election, making a majority of 332 votes in favor of the issuance of bonds. It appears further in this connection that a free and fair expression of the popular will has been obtained in this election, and that there is no ground for a charge of fraud, nor any proof of same in the conduct of the election, and that all irregularities claimed, even if they had actually existed, would not affect the result. Accordingly, this commission declares and certifies the result of the said election as above. J. H. Saye, Chairman; L. A. Harris, Secretary; J. T. Crawford, W. P. Goodman, as constituting the majority of the members of the York County Permanent Road Commission. York, S. C., November 6, 1923.

Being unable to agree with my brethren of the Permanent Highway Commission of York County, in declaring the election held on the 23d of October, 1923, legal, and they having filed a report setting forth their reasons for so sustaining said election, the undersigned desires likewise to state his reasons for his dissent.

The grounds of contest before the board are briefly as follows:

(1) That the opening of the books of registration by one of the supervisors of registration on the day of election, and the issuance of certificates, denominated "duplicates," was illegal.

(2) That the acceptance by the managers of election at Fort Mill and Rock Hill of certificates of a former county treasurer that the holder thereof had paid his or her taxes, or that no such taxes were charged against the holder, was illegal.

(3) That the failure of the managers of election at Fort Mill to require voters to produce proof of the payment of *all* taxes, including municipal taxes, rendered the election

at that place null an void, so far as that box is concerned, and the failure of part of the managers of election at Rock Hill to require of voters proof of the payment of all taxes, including municipal taxes, rendered the election at that precinct null and void as to such illegal votes.

(4) That the failure of the managers of election at Fort Mill to require voters to take the oath required of voters rendered the election, so far as that precinct is concerned, null and void.

(5) That there were sufficient of such irregularities and illegal voting to change the result of the election, or at least to leave the result in doubt.

1. Discussing the first ground of contest, the facts are briefly as follows: On the day before the election F. E. Clinton, one of the supervisors residing at Rock Hill, had a 'phone conversation with Mr. J. D. Gwinn, another of the supervisors of registration, living in the western part of the county, relative to opening the books of registration, for the purpose of issuing "duplicate" certificates of registration to persons who claimed to have lost their certificates.

There is quite a difference between these officers as to what authority one gave to the other in the matter, but I deem it unnecessary to a determination of the vital question before the board to decide just what authority one gave the other to use his name in the issuance of said so-called "duplicate" certificates. Nevertheless, on the day of election Mr. Clinton issued 149 of said so-called "duplicate" certificates, and the proof is that of this number 111 of them were used by electors, and on which they were allowed to vote. No notice had been given the public as required by law as to the opening of books of registration at places other than at the county seat, and the supervisor at Rock Hill visited no other precinct on the day of election for the purpose of issuing said duplicate certificates or certificates of any kind. In fact this officer testified before the board that, had applications come from half dozen other precincts to come

and issue such certificates, he would not have gone. It is a further fact that Mr. Gwinn in Western York was applied to for duplicate or renewal certificates and refused to issue any. The certificates so issued bore the number of the voters lost certificate and the date on which the lost one was issued, but was signed, not by the officers who originally issued them, but by two of the present incumbents. The officer was asked why he failed to follow the usual method of issuing another certificate with the date of issue thereon and a new number ·in accordance with what was the universal custom of the board in the past when registering voters at the time and places required and allowed by law. No satisfactory reason was given for making the change, and it was admitted that the board nor any of the members had ever issued "duplicate" certificates before.

It was further established that *the books of registration with the other records of registration* had not been filed with the Clerk of Court.

Now as to the law:

The Board of Registration is a creature of the statute, and hence can do only those things which the statute empowers them to do and in the way they are empowered and when empowered by the statute, and such things that are *incident and necessary* to the performance of their duties.

In brief, the board is created and authorized to register new voters, issue renewal certificates in cases where old ones have been lost, transfer voters from one precinct and county to another, conduct the · general registration every 10 years, purge the lists 10 days before an election, and furnish the managers with the poll lists of the various precincts. Furthermore, the statute specifies definitely, certainly, and specifically when, where, and on what notice the books may open for the registration of voters and the performance of the duties of the office by the board. In every instance where reference is made to their duties in connection with elections, general or special, the statute states

distinctly that the books must be closed and remain closed
30 days before any such election, and until the election shall
have been held.   There is nowhere in the statute any ex-
ception to the last-mentioned rule.   It would seem that pos-
sibly the whole question revolves around the meaning of the
word "close."   It seems to me that common sense meaning,
in fact, the only reasonable meaning, that can be given to
the expression, is that when the statute says the books shall
be closed 30 days before an election it means that for that
period the board shall cease to do business, shall·cease to
function at all.   If this be true, then one of the board could
have no more right to issue any certificate of any kind than
the writer could.   We frequently see signs on the doors of
our stores to the effect that the store is closed taking stock.
What does it mean?   Simply and solely that for the purpose
of functioning and doing business with its customers it is
closed, although the doors might be wide open.   In like
manner when the statute says the books shall be closed it
means that the board of registration shall cease to do busi-
ness until the period of suspension is up.

It is argued in opposition to the position taken that no
time is specified when the renewal certificates may be issued,
but it would appear inevitable that when the statute specifies
when and where the board shall function it certainly means
that it can function only at those times and places.   Being a
body of limited power it must point out something in the
statute that authorizes them to act at times other than those
specified in the statute.   This cannot be found in the law,
because it is absolutely not there.

Again, it must be admitted that the law intends that
every person entitled to register shall have equal opportu-
nity with every citizen to do so, and that when the books
are opened at any one place he has a right to be advised of
it by public notice to that effect, otherwise he is being dis-
criminated against.   When asked if he would have gone to
six other precincts the day of election if asked to do so, the

officer replied that he would not.  He certainly had in mind the idea that the law did not require him to do so, and, if it did not require him to do so, where in the law is there any provision allowing him to do so?  To grant such a contention would be to admit that during the 30 days before election the board could divide itself up into three groups, each authorizing the other to sign their respective names, go to such precincts as they desired to favor, and register those who they desired to register, and answer others not favorable to their way of thinking on the election by stating that the law does not require this, and I do not care to register you.  It would resolve itself into the proposition first come first served, if I like your looks, but not served at all if you don't vote the way I desire you to vote.

I am free to say that I do not believe Mr. Clinton had any such thing in mind in doing what he did, I am only trying to show what an instrument of fraud and wrongdoing the board of registration might become were the law such as respondents claim it to be.  And yet in this very election we find one set of voters clamoring for registration duplicates, and getting them, and another set on the other side of the county likewise clamoring for them, and not getting them.

I am therefore constrained to hold that all of the votes cast at Rock Hill and Fort Mill on these certificates were illegal.

2.  As to the second ground of protest, the acceptance of certificates by a former treasurer that voters had paid their State and county taxes.

The facts in brief are as follows:

The persons in Rock Hill actively at work to see that the election should carry applied to the present county treasurer to go to Rock Hill the day of election or to send a deputy to write tax receipts and certificates to persons who had lost them.  He was unable to go, and finally consented to allow his tax duplicate book for the year 1922 to be carried

over there by Mr. H. E. Neil who, up to about the first or middle of July, 1923, had been the county treasurer. Mr. Neil testified that he did not go as the deputy of Mr. Thomasson, the present treasurer, and Mr. Thomasson testified he did not send Mr. Neil as such. There can be no doubt that Mr. Neil was more familiar with this tax duplicate than any person in the county, it having been made up during his administration.

Mr. Neil testified that he was quite busy practically all day issuing the certificates as to payment of taxes. He was unable to specify how many he did issue, but estimated the number at around 100. I am quite confident Mr. Neil was entirely honest in his estimate of the number of certificates he wrote, and I am inclined to think it is too small, but as stated above I intend to accept his figures at 100.

These certificates were accepted by the managers as proof of the payment of taxes by the voters.

Was this legal proof? The Constitution and the Code provide that the voter must be required to produce (as a prerequisite of voting) "proof of the payment of all taxes, including poll tax, assessed against him and collectible during the previous year. The production of a certificate or of the receipt of the officer authorized to collect such taxes shall be conclusive proof of the payment thereof."

The only decision of our Supreme Court on the construction of this language is found in the case of *State v. Board of Canvassers,* 86 S. C., 456; 68 S. E., 678. While the question is not squarely decided at the same time the language used by the Court is sufficient index of what the language means to stand on until the Court declares otherwise.

"Just what proof of payment of taxes, other than the certificate or receipt of the officers authorized to collect taxes, which is made conclusive proof thereof, will satisfy the statute it is not now necessary to decide. But when the Legislature used the word 'proof,' it meant legal and com-

petent evidence, furnished by affidavit, or in some other *legal form,* and such as would satisfy a reasonable mind of the truth."

The proof must be affidavit or legal and competent proof. I am unable to see how in any sense a certificate such as was used could in any way be classed as an affidavit or competent or legal proof that would be accepted in any Court as legal and competent evidence. It was at most hearsay evidence gotten from books and not from the personal knowledge of the person so certifying (except in some isolated case), and not sworn to either as a correct statement from the books nor as correct from the knowledge of the certifier. I am therefore forced to conclude that 100 votes cast on the strength of such certificates at Rock Hill and Fort Mill were illegal.

It appears further that 10 certificates and verbal statements emanated from the banks at Fort Mill as to the payment of taxes, which likewise and under the same principle must be declared illegal. Making 110 illegal votes cast at the two places for the reasons stated above.

3. The third ground: The failure of managers at Rock Hill and Fort Mill to require proof of the payment of *all* taxes, including town taxes as a prerequisite to voting.

The manager at Fort Mill testified that no such requirement was made at Fort Mill at all, as to the payment of municipal taxes.

One of the managers at Rock Hill testified that he did require proof of the payment of municipal taxes, which another manager testified that he did not. It is true that this manager qualified his statement by saying that some did produce such proof, but how many such he did not attempt to make such an estimate.

It need hardly be argued that the law as interpreted by the Supreme Court requires the managers to require proof of the payment of all taxes and a registration certificate before a person will be allowed to vote, *and, unless this is*

*required by the managers,* the election is void. I understand both sides concede this to be the law.

The manager then having admitted that he did not require such proof, it is *prima facie* to be held that all of the persons voting during his period of duty voted illegally, and it would seem to throw the burden on the side of the respondents to show then how many of the voters under this manager did produce such proof. This was not done. The testimony is that this manager was on duty one-third of the time, and it is reasonable to assume and should be assumed that he superinteded the voting of at least one-third of the voters at Rock Hill. This would be 226 votes cast before him, where the proof of payment of municipal taxes was not required.

Likewise it would make illegal, if illegal, the 132 votes cast at Fort Mill, a total of 358 votes in question.

What does the Constitution and statutes say as to the payment of taxes as a prerequisite to voting?

(e) *Payment of Taxes Necessary for Voting.*—Managers of election shall require of every elector *offering to vote at any election* before allowing him to vote, proof of the payment of *all taxes,* including poll tax assessed against him and collectible during the previous year. The production of a certificate, etc. Constitution 1895, Art. 2, Par. 4 (e).

Managers of election shall require of any elector offering to vote at *any* election, before allowing him to vote, in addition to the production of a registration certificate, proof of the payment of *all taxes,* including poll tax assessed against him and collectible during the previous year. The production of a certificate, etc., Volume 3, Code 1922, § 241.

(222) Sec. 21. *Who Entitled to Vote in Municipal Elections.*—Every citizen of this State * * * who has resided within the corporate limits * * * and has paid *all* taxes due and collectible for the preceding fiscal year

and who has been registered   *   *   *   shall be entitled to vote at all municipal elections of his city or town. Volume 3, Code of 1922.

It were foolish to argue that *all* does not mean all unless there be some words of modification in the statute or the Constitution, and it were likewise foolish to say that the words, *offering to vote at any election,* does not embrace all elections, unless there be modifying words in the Constitution and statutes. There are no such modifying words to be found anywhere, and no attempt has been made to point them out. The only argument advanced has been two-fold:

First. That the law contemplates that an election held by a county is one by a higher governmental department than a municipality, and while the payment of all taxes will be required to vote in a municipal election, the higher unit, the county, is not concerned about whether the municipal taxes have been paid or not. But the Constitution says that to vote at *any election* you must prove payment of *all* taxes. If an oath were required of an elector at an election similar to the one just held to the effect that the voter solemnly swears that he has paid *all* taxes assessed against him and collectible during the previous year, could he make that oath truthfully if he had not paid his town taxes, if such had been assesed against him? Hardly.

If the words *all taxes* are not completely comprehensive, and refer only to the taxes due to the governmental department under which the election is held, and that they have no relation to the taxes that may be due the lower governmental department, then it would be possible to have four classes of voters in this State: Those voting in the federal election need have paid only federal taxes. Those voting in State elections need have paid only State taxes. Those voting in county elections need have paid only State and county taxes. Those voting in municipal elections must have paid every species of tax assessed against them.

In other words, it would be harder to vote in town than in the country, and a greater burden would then be placed upon the municipal voter than any other species of citizen. No one believes for a moment that the law contemplates any such thing as this, and yet such would be the result if the principle contended for by respondents should obtain.

I feel perfectly safe in holding that *all* means *all* under the laws of this State, and that it was an irregularity on the part of the managers of election not to require proof of the payment of municipal taxes as well as county and State taxes.

A further argument was advanced that it was common sense to suppose that the law intended what respondents contend for above. When asked why it was common sense, the only answer that was obtainable is the answer we men have heard since the dawn of creation "because." Which is the better common sense view, to say that all voters shall be placed on a parity in the matter of tax requirements, or that there shall be four classes of voters with respect to taxes? It seems to me the answer is self-evident.

This then will account for 358 illegal votes.

The fourth ground of contest: The managers at Fort Mill failed to administer to voters the oath required by the statute.

Sec. 236, Vol. 3, Code of 1922, requires that the managers "shall administer to each person offering to vote an oath that he is qualified to vote at this election, according to the Constitution of this State, and that he has not voted during the election."

The language of this provision is just as mandatory as the language of the Constitution that the managers *shall* require of voters production of registration certificates and proof of payment of taxes.

The Supreme Court has held that the *failure of the managers* to demand the latter (registration certificates and payment of taxes) vitiates the election. I therefore see no

reason why their failure to administer the oath would not likewise be a fatal defect.

It appears in one of the cases cited that the Supreme Court has intimated (possibly) that the requirement as to the oath is merely directory, and hence would not vitiate the election; but it does not appear that the point was clearly and definitely decided.

There appears to me in this case to be more definite and certain reasons why the oath should have been administered by the managers than there would have been had the board of registration complied with the law and purged the rolls 10 days before the election. This was not done, and there may have appeared on the rolls the names of persons registered who since the last registrations had forfeited their citizenship in one of the several ways provided by statute and hence, although duly registered and proving payment of taxes, would still be not entitled to vote.

The manifest purpose of the oath is to require the voter to make legal proof of the fact that he has not become disqualified from voting since his registration.

The Supreme Court has held (*Wright v. State Board,* 76 S. C., 574; 57 S. E., 536), that the oath taken by a voter does not cure the defect in failure to prove payment of tax. The oath then must be required to prove his not having been disqualified as above suggested.

Not having before them a purged roll as required by law, it would seem that it was eminently proper and necessary for them to have administered the oath to each and every voter as a means of purging the rolls.

The testimony is that about one-half of the voters at Fort Mill were not required to take oath. This would account for 66 illegal votes, if so adjudged illegal.

5. Were there enough illegal votes to affect the result or to leave it in grave doubt?

From the foregoing it will be seen that there were irregularities in the following particulars:

Irregular registration certificates ................. 111
Irregular tax proof ............................ 110
No town tax proof of payment .................. 358
Voters not sworn .............................. 66

Total irregularities .......................... 645

The purpose of the foregoing statement is to show how many irregularities existed at the election, but, of course, since much of this is duplication it does not necessarily follow that there were 645 irregular independent votes.

Grouping them, however, in such manner as to avoid duplication we find the following:

Irregular proof of payment of taxes............... 110
Irregular registration .......................... 111
No proof of payment of town taxes at Rock Hill and
    Fort Mill ............................... 293

Total irregularities ..................... 514

As this number is far more than necessary to change the result, the election should be set aside. W. W. Lewis, Member York County Permanent Road Commission acting as a Board of Canvassers of Election. November 8, 1923.

*Messrs. Wilson & Wilson* and *Marion & Finley,* for appellants, cite: *Authority of commission:* Act. Mar. 20, 1922. *Issuance of certificate:* Sec. 214, Vol. 111, Code 1922; Art. 2, Sec. 4, Const. 1895. *Right to vote and registration of voter and voters:* Art. II, Sec. 4 (e) and (f), Const. 1895; 76 S. C., 573; Art. II, Sec. 11, Const. 1895; Vol. 3, Code 1922, Sec. 207; 214, 215; 221, 241. *Certificate of registration:* 78 S. C., 467; 79 S. C., 246; 101 S. E., 41; 86 S. C., 451. *Oath:* Vol. 111, Code 1922, Sec. 236; 86 S. C., 460; 97 S. C., 9. *Statutes were directory not mandatory:* 9 R. C. L., 1094. *Black on Interpretation of Laws:* 353; 19 Ohio, St. 25; 36 Ark. 36. *Elimination of votes:* 97 S. C., 9; 101 S. E., 41.

*Messrs. McDonald & McDonald,* for respondents, cite: *Undisputed facts makes question one of law upon a Writ of Certiorari:* 119 S. E., 905. *Registration:* Art. II, Sec. 4 (b and f) 8, 11; Const. of 1895, Vol. 3, Code 1922, Sec. 207, 209, 211, 214, 220, 219, 241; Vol. 2, Crim. Code 1922, Sec. 473; 84 S. C., 50. *Terms of Constitution and Statute mandatory:* 84 S. C., 48; 76 S. C., 574; 107 S. C., 209; 117 S. C., 545. *Officers authorized to collect taxes:* Vol. III, Code 1922, Sec. 494-511. *Certificates issued not acceptable:* 76 S. C., 574; 86 S .C., 451. *Failure to administer oaths:* Vol. III, Code 1922, Sec. 286; 86 S. C., 460. *Proof of taxes paid:* 107 S. C., 215; Art. X, Sec. 1; Const. of 1895; Act. March 13, 1922. *Contested election:* 97 S. C., 1; 86 S. C., 451; 102 S. C., 256; 9 S. C., 94; 78 S. C., 461.

October 25, 1924.

The opinion of the Court was delivered by MR. JUSTICE COTHRAN.

Proceeding by *certiorari* in the Court of Common Pleas for York County, for the purpose of reviewing the action of the Permanent Road Commission of York County, acting as a board of canvassers, in declaring the result of an election held on October 23, 1923, upon the question submitted under the Act of March, 1923 (33 Stat. at Large, p. 881), of the issue by the County of $2,000,000 of road bonds, in favor of such issue.

After the election had been held on October 23, 1923, the board of canvassers met on October 30th, for the purpose of canvassing the election, tabulating the returns, and declaring the result of the election. At that meeting certain citizens (the respondents in this appeal), appeared and filed a formal protest and contest against the validity of the election, upon various grounds which will later be stated. The board took a mass of testimony, which is set out in the record, and decided by a vote of 4 to 1, to overrule all objections and declare that the election had been carried in

favor of the issue of bonds, by a vote of 1,005 to 673, a plurality of 332 in favor of the issue.

Thereupon the protesting citizens filed a petition for a writ of *certiorari* to review this action of the board of canvassers, which was duly issued, and to which the board made return. The matter then came on to be heard by his Honor, Judge Henry, upon the report of the board, the dissent of Col. Lewis, a member, the protest, the testimony taken, the writ, and the return.

On January 11, 1924, Judge Henry filed a decree over-ruling the report of the board, sustaining certain of the grounds of protest filed by the petitioners, and holding "the election held at the precincts of Ebenezer, Rock Hill and Fort Mill, null and void," and that, consequently, a majority of the votes in the County was against the issue of the bonds, that is 567 to 268, eliminating these three boxes.

It will be observed in passing that Judge Henry did not declare the election void; on the contrary, he held that, by reason of the irregularities at the three precincts named, the votes at those precincts must be eliminated, *resulting in a valid election against the issue.* From this decree the per-manent road commission has appealed, one of its members not participating in the appeal.

The petition for the writ of *certiorari* follows the general lines of the protest, in its attack upon the validity of the election as a whole, and in addition insists that for irregu-larities and illegalities at the precincts of Rock Hill and Fort Mill, those boxes should be thrown out entirely, leaving the result against the issue of bonds. It omits the attack contained in the protest against the vote at Ebenezer pre-cinct.

The Circuit Judge declined to set aside the election in toto; on the contrary, he confined his decree to a consider-ation of the alleged irregularities and illegalities at Rock Hill, Fort Mill, and Ebenezer (although, as stated, the at-tack upon the vote at Ebenezer, contained in the protest, is

omitted from the petition), and held that by reason thereof those boxes should be thrown out entirely. The result accordingly was:

| | | |
|---|---:|---:|
| Total votes for bonds | | 1005 |
| Less: | | |
| At Rock Hill | 621 | |
| At Fort Mill | 97 | |
| ·At Ebenezer | 19 | 737 |
| Net vote for bonds | | 268 |
| Total votes against bonds | | 673 |
| Less: | | |
| At Rock Hill | 59 | |
| At Fort Mill | 35 | |
| At Ebenezer | 12 | 106 |
| Net vote against bonds | | 567 |

He, therefore, held that the result of the election was a "majority in the County against the issue of bonds."

Omitting, for the reason stated, a consideration of the alleged irregularities and illegalities in the conduct of the election at Ebenezer, the question for consideration and decision is whether or not the alleged irregularities and illegalities in the conduct of the election at the precincts of Rock Hill and Fort Mill, are legally sufficient to justify the conclusion of the Circuit Judge that those boxes should be thrown out entirely, leaving the result against the issue of bonds.

Taking up the specific charges of irregularities at these precincts (Rock Hill and Fort Mill), we find that there are three : (1) That persons were allowed to vote without requiring of them the production of registration certificates; (2) that persons were allowed to vote without requiring of them proof of the payment of all taxes, State, County, municipal, poll, and State income tax, due for the year 1922;

(3) that persons were allowed to vote without having been sworn as required by law.

The first two charges apply to both Rock Hill and Fort Mill; the third to Fort Mill only.

Certain specific objections were made to the entire election: (1) That the Supervisors of Registration failed to revise the list of registered electors as required by Volume 3, Code of 1922, § 215; (2) that the books of registration were not closed and kept closed for 30 days preceding said special election, and kept in the custody of the Clerk of Court, as required by Volume 3, Code of 1922, § 220.

Inasmuch as these questions are not passed upon in the decree, and its result is to affirm the validity of the election (eliminating the votes at Rock Hill, Fort Mill, and Ebenezer), it must be assumed that they were not sustained, and are not, therefore, before us for consideration.

The facts as to these alleged irregularities are fully set forth in those portions of the record for appeal hereinafter directed to be reported, and need not be repeated here. Assuming, but not deciding, the validity of the objections, it is demonstrable that the alleged irregularities could not have altered the result of the election, and were, therefore, insufficient to vitiate the entire votes at the precincts of Rock Hill and Fort Mill. It will be observed that the alleged irregularities and illegalities, by reason of the unauthorized use of duplicate registration certificates, the lack of the proper proof of the payment of taxes, and the omission to administer the oath to voters, are confined to the two precincts of Rock Hill and Fort Mill; there is no general attack upon the election as a whole based upon them.

Objections to the conduct of an election assume these aspects: (1) Where the illegal voting appears to have been so general that the entire election was necessarily affected thereby, in which case the entire election is vitiated and must be annulled; (2) where the illegal voting is confined

to only a few of many precincts, in which case the rejection of the vote of the precincts thereby affected will not necessarily vitiate the entire election, and the question whether the entire vote of the precinct affected shall be eliminated, or only the illegal votes deducted, depends upon the practicability of purging the roll of such illegal votes, and upon the further inquiry whether or not the presence of such illegal votes has produced an erroneous result in the entire election; (3) where the illegal voting has occurred in such a large number of precincts as to indicate a controlling effect upon the entire election, in which case the entire election will be annulled.

As is said in the case of *State v. Board,* 86 S. C., 451; 68 S. E., 676:

"In the elections reviewed in *Wright v. Board* and *Gunter v. Gayden,* it appeared that the illegal voting was so general that the whole election was thereby affected, and, therefore, vitiated. But when the illegal voting is confined to only a few of many precincts, the rejection of the vote of the precincts thereby affected will not necessarily vitiate the entire election."

The Court adds:

"There may be cases, however, in which the number of precincts rejected on account of fraud or illegal voting is so large that the whole election will be declared void, even though the result at the other precincts would remain unchanged."

We think that the same result would follow where the vote at the rejected precincts bears a very great proportion to the whole number of votes cast, as in the case at bar, where it appears that the vote at Rock Hill and Fort Mill constituted 80 per cent of the total.

If, therefore, it has been shown that the voting at these two precincts was so permeated with illegality as to require the elimination of the entire vote there, in consideration of the immense proportion of the entire

vote cast at these two precincts, and in analogy to the principle announced and quoted above, the entire election should be declared void.

The facts as found by the board of canvassers are not open to contrversy in proceedings by *certiorari* unless the findings are without evidence to sustain them. "It is well settled that this Court will not review the findings of fact of an inferior Court or body, on writ of *certiorari,* unless they are wholly unsupported by the evidence." *Jennings v. McCown,* 97 S. C., 484; 81 S. E., 963.

The board has found, and there is an abundance of evidence to sustain them, the following facts in reference to the issuance of so-called duplicate registration certificates:

| | | |
|---|---:|---:|
| The total number written up by Clinton, one of the board of registration, was ............ | | 147 |
| Of these there were destroyed.............. | | 5 |
| Leaving .............................. | | 142 |
| There were issued at Rock Hill ............. | 104 | |
| And at Fort Mill ........................ | 38 | 142 |
| Of those issued at Rock Hill ............... | | 104 |
| There were not used ...................... | | 6 |
| Actually issued and used .................. | | 98 |
| Of those issued at Fort Mill ............... | | 38 |
| There were not used ...................... | | 22 |
| Actually issued and used .................. | | 16 |
| Total number actually issued and used at both precincts .......................... | | 114 |

Assuming that all 114 were issued to and used by voters who favored the bond issue, of which assumption the con-

testants cannot complain, there would remain a majority in favor of the bond issue of 332 — 114 = 218.

The board has also found as a fact, of which there is ample support in the evidence, in reference to the certificates as to payment of taxes, that the total number issued did not exceed 100 at Rock Hill, and that there were 10 issued by bankers at Fort Mill, making a total of 110. Assuming that all 110 were issued to and used by voters who favored the bond issue, of which assumption the contestants cannot complain, there would still remain, after deducting 114 for the duplicate registration certificates, and 110 for the certificates as to payment of taxes, from the apparent majority of 332 (332 — 224), a majority of 108.

It is alleged in the petition, and practically conceded in the report of the board, that at least one-helf of the voters at Fort Mill were allowed to vote without having been sworn as required by law. At Fort Mill there were 132 votes cast. We may assume that not only one-half but all of the 132 were not sworn, and eliminate the entire vote of 97 for, and 35 against, the bond issue, a majority of 62 for the bond issue. Deducting that number from the net majority above stated of 108, and there still remains a majority of 46. All that the contestants claim, however, to be illegal is one-half of the 132 votes—66; an equal number are conceded to be legal, and they, added to the 46, increase the majority to 112.

Or take the most favorable aspect of the situation conceivable under the evidence:

Eliminate the majority in favor of the bond issue at
Fort Mill .................................. 62
Eliminate the votes at Rock Hill upon the questioned
registration certificates ...................... 98
Allow 50 or more votes than the board estimates (100)
to have been based on the questioned certificates
of payment of taxes at Rock Hill .............. 150

And we have a total of ........................ 310

Which deducted from the 332 apparent majority, still leaves a majority of 22. This is upon the assumption that all of the votes at Rock Hill were cast *in favor* of the bond issue, and gives the contestants, without diminution, the full benefit of the 59 votes in opposition. The evidence shows that some, at least, who used the questioned certificates of registration and payment of taxes voted *against* the bond issue.

There is absolute unanimity in the decisions of this Court and elsewhere, that, in the absence of fraud, it is incumbent upon a contestant to show, not only that there were irregularities or illegalities in the conduct of an election, but that such irregularities or illegalities were either such as to produce an erroneous result or to leave that question in doubt. But that where the election can be purged of such improper votes and it is demonstrated that the result is the same as if they had not been cast, the election will not be disturbed. We can conceive of no method of purging that could give less offense to the contestant than to assume that all of the questioned votes were cast *against* him; for the greater the number cast *for* him, the less is the probability that the result would have been otherwise.

"Unless it is expressly declared by statute that the particular act is essential to the validity of the election, or that its omission will render it void, an election which appears to have been fairly and honestly conducted will not be vitiated by mere irregularities, which are not shown to have affected the result. In the absence of fraud, the misconduct of election officers or irregularities on their part will not justify rejecting the whole vote of a precinct, where it does not appear that the result was affected thereby, even though the circumstances may be such as to subject the officers to punishment." 20 C. J., 180.

"The great object of elections is to obtain the will of the people, and when that is expressed in a free and fair election, the Court will not defeat it on account of irregularities, or even illegalities, which do not appear to have affected the

result. But when they are of such character and extent as to leave it doubtful whether the result has not been affected, and especially when it appears that illegal votes have been cast, sufficient in number to affect the result, and the polls cannot be purged of them, it would be a travesty on popular government to sustain the election." *Wright v. Board,* 76 S. C., 574; 57 S. E., 536.

"The universal weight of authority is to the effect that where the result of an election is not made doubtful nor changed, irregularities or illegalities in the absence of fraud will not cause the expressed will of the body of voters to be set aside." *State v. Board,* 78 S. C., 461; 59 S. E., 145; 14 L. R. A. (N. S.), 850; 13 Ann. Cas., 1133.

"Unless the result of an election is changed or rendered doubtful, it will not be set aside on account of mere irregularities or illegalities." *State v. Board,* 79 S. C., 246; 60 S. E., 699.

"When it appears that enough illegal votes were cast in any election to change the result, the election must be declared void." *Gunter v. Gayden,* 84 S. C., 48; 65 S. E., 948.

"While the vote was very close, 52 for bonds and 48 against it, it does not appear that the managers rejected more than one, possibly two, on this ground, who would have voted against bonds, hence it is not made to appear that the rule of the managers probably had the effect of altering the result." *McLaurin v. Tatum,* 85 S. C., 444; 67 S. E., 560.

When it appears that enough illegal votes were cast in an election to change the result or make it doubtful, it will be declared void. *State v. Board,* 86 S. C., 451; 68 S. E., 676.

"When the polls can be purged of the illegal votes this should be done, and only the illegal votes should be rejected, and the legal votes should be counted. But when this cannot be done the entire poll must be thrown out, if it appears that enough illegal votes have been cast to affect the result at such poll, or to leave it in doubt." *State v. Board,* 86 S. C., 451; 68 S. E., 676.

"Illegal votes where they can be eliminated from the count without affecting the result do not vitiate the election." *Rawl v. McCown,* 97 S. C., 1; 81 S. E., 958.

"It is equally well settled that, when a sufficient number of illegal votes have been cast in an election to affect the result, and the polls cannot be purged of them, the election cannot be sustained." *Jennings v. McCown,* 97 S. C., 484; 81 S. E., 963.

"The true doctrine is that whenever the irregularity or illegality is such that the result of the election would be placed in doubt, then the election must be set aside." *Callison v. Peeples,* 102 S. C., 256; 86 S. E., 635, Ann. Cas., 1917E, 469.

"We merely affirm the judgment that the election was void, on the ground that it appears upon the face of the proceedings that enough illegal votes were cast of which the poll could not have been purged to have affected the result or to have rendered it uncertain." *Clark v. McCown,* 107 S. C., 209; 92 S. E., 479.

"These votes were illegal, and, as there were enough of them to have changed the result, and as the poll could not have been purged of them because it did not appear how they voted, the election was thereby vitiated." *Abernathy v. Wolfe,* 117 S. C., 545; 109 S. E., 275 (quoting from *Clark v. McCown,* 107 S. C., 209; 92 S. E., 479).

If the highly prized right of voting is to be recognized, the right to have that vote counted is an essential incident of the right to vote. At most, there were not over 200 votes at Rock Hill that came within the objections of the contestants. Considering that they were all in favor of the bond issue there were left 420 votes at that precinct in favor of the bond issue, as to which no objection was interposed. The electors thus voting should not be deprived of the right to have their votes counted in the zeal to eradicate those alleged to have been illegal; they had rights as well as the contestants, and if the rights of both can be protected it should

be done. The same is true to a lesser extent of the votes at Fort Mill in favor of the bond issue.

"Voters who have done all in their power to cast their ballots honestly and intelligently are not to be disfranchised because of act of irregularity, mistake, error, or even wrongful act of the officers charged with the duty of conducting the election, which does not prevent a fair election and in some way affected the result." 15 C. J., 180.

This is written in reference to those voters whose votes are in question; certainly those whose votes are not in question should not be disfranchised (which would be the effect of throwing out the entire box), on account of illegalities connected with other votes, unless it should plainly appear that the number of such illegal votes was so great as probably to have produced the result complained of, or at least have left the question in doubt.

There is not the slightest evidence in the case of improper conduct on the part of the managers of election, who were advised by a most reputable attorney of the York county bar, and every circumstance indicates the desire and attempt to discharge the duties imposed upon them faithfully and fully as they understood them. The same may be said of the board of canvassers, some of whom are personally known to the Court, and who, advised by one of their number, a lawyer of the highest character and ability, have displayed every evidence of fairness.

Let the petition, the return, the report of the board of canvassers with the dissenting opinion of Col. Lewis, and the decree of Judge Henry, be reported.

The judgment of this Court is that the decree of the Circuit Court be reversed, and that the report of the board of canvassers be confirmed.

MR. JUSTICE WATTS and MR. ACTING ASSOCIATE JUSTICE M. L. SMITH concur.

MR. JUSTICE MARION disqualified.

MR. CHIEF JUSTICE GARY did not participate.

Acting Associate Justice P. F. Henderson (concurring) : While admitting the cogency of the reasoning upon which the leading opinion herein is based, which is to the effect that even though there be irregularities in an election, unless said irregularities affect the result or put the same in doubt, the election must be upheld, the respondent upon the reargument of this appeal vigorously challenged the accuracy of the various tabulations set out in the opinion of the Court. The respondent submitted that the number of alleged irregularly issued registration certificates could not be accurately determined, and especially that the number of alleged irregularly issued tax certificates could be determined with no accuracy whatsoever. A careful review of the testimony herein reveals the fact that a practically accurate count and checking of the registration certificates in question was made.

The showing as to the number of alleged irregularly issued tax certificates used as proof of the payment of taxes at the Rock Hill box is not so satisfactory. Mr. Neil, who issued these certificates kept no accurate count of their number as he issued them, due to the fact that he entirely relied upon the opinion of counsel that they were legal. When the matter was questioned he was naturally able only to give an estimate that he had issued not more than 100. He further stated that he might have said that he may have issued as many as 150. In the leading opinion of the Court his estimate of 100 certificates so issued is accepted, but the Court in its final analysis of the figures allows a count of 150. Inasmuch as this figure is the outside limit of any showing made by or on behalf of the respondents, the taking of this figure as a concession to the respondents in tabulating the whole vote would seem to be reasonable.

Inasmuch, however, as Mr. Neil further admitted in answer to the direct questions propounded to him that there was "no possible way now of telling the exact number of these certificates," it may be proper for the Court to de-

termine the legality of the use of said certificates, and my preference is to do so.

The Constitution provides that managers of election shall require of each prospective voter "proof of the payment of all taxes." The production of a tax receipt or the certificate of the officer authorized to collect taxes is made "conclusive proof" of payment. Manifestly then a lesser degree of proof than absolute "conclusive proof" may be accepted by the managers.

In *State ex rel. Davis v. State Board of Canvassers,* 86 S. C., 451; 68 S. E., 676, at certain election boxes the managers actually agreed not to require proof of the payment of taxes. After the election they testified that they knew the voters personally, and were satisfied that they had paid their taxes, and that they were informed that the sheriff had not been in the neighborhood to levy and collect tax executions, and that the inference was that all people in that community had paid their taxes. The Court upon this showing tersely ruled: "Such a palpable attempt at evasion of the law will not be tolerated."

The question then presented in the present inquiry is to find the mean between these two extremes.

In the present case it appears as uncontradicted that H. E. Neil had been treasurer of York County during 1922, when the taxes in question had been paid. He had collected said taxes, and either personally or by deputy had issued the certificates and made the entries on the tax books. Before the election Neil had been succeeded by W. D. Thomasson. With the acquiescence of Thomasson, the treasurer of the county, Neil, the ex-treasurer, took the tax books to Rock Hill. The managers of election made a formal ruling, embodied in a letter to Neil, to the effect that they would accept certificates issued by him to the voters as evidence of the payment of the taxes, or of the fact that no taxes were assessed against certain voters. Neil then, without any hint of partiality or discrimination, issued certificates, after

actually consulting the tax books, which were then in his charge, to all voters who applied. In the decision of the Court in *State v. State Board of Canvassers, supra,* after condemning the "palpable attempt at evasion of the law," therein set out, the Court said:

"Just what proof of payment of taxes, other than the certificate or receipt of the officers authorized to collect taxes, which is made conclusive proof thereof, will satisfy the statute, it is not now necessary to decide. But when the Legislature used the word 'proof,' it meant legal and competent evidence, furnished by affidavit, *or in some other legal form, and such as would satisfy a reasonable mind of the truth.*"

A reasonable construction of this language and of the Constitution itself is that in the first instance (subject to review by the Courts, of course) the managers of election may pass upon the sufficiency of the proof presented, and if the same is in some proper legal form, which need not necessarily be so formal as an affidavit, that the same may be accepted if it is such as will reasonably satisfy the mind of the truth of the question under inquiry, viz.: the payment of taxes by the taxpayer. The managers of election at Rock Hill in this instance carefully considered the matter of requiring proof of the payment of taxes, and while they did not require the production of a tax receipt or of a certificate from the treasurer of York County himself, they carefully required what might be considered the next best evidence obtainable, viz.: a certificate signed under his approval by his predecessor in office who had actually collected the taxes, and who gained the knowledge expressed in his certificates from the books themselves.

The language quoted hereinbefore from the *Davis Case* is possibly a mere dictum of the Court, but its logic is irresistible.

In my opinion, under the Constitution and the reasoning of the *Davis Case* (while the practice of taking the tax book

6—S. C. R., 130

away from the treasurer's office may be exceedingly unwise, and should not.be followed in future elections) the fact that the election managers at Rock Hill actually did adopt the course of procedure followed herein and actually did determine to accept Neil's certificates as evidence of the payment of taxes, would prevent the rejection of the votes presented, under the plan followed, unless the Court upon review could say that the evidence so acted upon was entirely illegal, and was not such as would satisfy a reasonable mind that the taxes had been paid.  Manifestly, however, Neil's certificates could not be said to be so irregular as to merit, upon review, such a condemnation by the Court, and they certainly furnish convincing evidence of the payment of taxes.  Hence the votes affected thereby could not, in my opinion, have been rejected.

Both for the reasons stated in the leading opinion of the Court herein, and for the reasons herein indicated, I concur in the reversal of the Circuit Decree.

Mr. Justice Fraser (dissenting) :   I think the whole election should be declared void.